1
2
3
4
5
6
7

FILED & ENTERED

JUN 15 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fisherl    DEPUTY CLERK

8
9
10

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

11
12    In re:
13    Luis Angel Flores
14
15                              Debtor(s).
16    Luis Angel Flores
17
                         Plaintiff(s),
18        v.
19    Evelyn Gonzalez, Calzadilla Antonio
20    Marco
21
                         Defendant(s).
22

CHAPTER 13

Case No.:  1:20-bk-11873-MB
Adv No:   1:22-ap-01026-MT

**MEMORANDUM OF DECISION
AFTER TRIAL**

Date:        May 16, 2023; May 24, 2023
Time:        10:00 a.m.
Courtroom:  302

23
24        This is a Chapter 13 case where the debtor, Plaintiff Luis Angel Flores ("Flores"
25    or "Plaintiff"), has brought a declaratory judgment action against two creditors for whom
26    he executed promissory notes secured by Deeds of Trust against his home. The
27    operative facts arise out of Flores' business as a party promoter specializing in
28    weddings and quinceñeras.

<u>Introduction</u>

Defendants Evelyn Gonzalez and Marco Antonio Calzadilla (individually "Gonzalez" and "Calzadilla," collectively "Defendants") are the owners of three banquet halls located in the Los Angeles area.  They operate the halls under the name AC Fiesta. Defendants generally provide their services and banquet halls directly to their customers as a package which includes the food, drinks, entertainment, and other related party items. Defendants also rent the banquet halls to third parties who arrange the celebrations for their customers as a package which may also include services provided by Defendants.

Sometime in the spring 2017, Plaintiff approached Defendants regarding renting their halls for a number of quinceñera and wedding celebrations for Plaintiff's customers. Plaintiff was in the business of providing a banquet hall to put on quinceñera parties, weddings, and the like for his customers.  Plaintiff claimed that he had lost the lease for the banquet hall he had been using, and he wanted to rent Defendants' halls for his events. Defendant Calzadilla had known Plaintiff for over 30 years, so he rented the halls to him.

Defendants contend that Plaintiff also requested that Defendants extend credit to him for the events, as his business had been growing and he was short of cash.  The extent of cash paid, and credit extended, is in dispute but there is no dispute that three promissory notes and Deeds of Trust were executed over the course of the parties business dealings (referred to collectively as the "Notes"). All were secured by Plaintiff's

residence located at 12559 Community Street, Sun Valley, California (the "Community Street Property").

Plaintiff filed a Chapter 13 petition on October 20, 2020.  He confirmed a 100% plan wherein he listed a $20,000 secured claim to Defendant Gonzalez.  Defendants did not object to the plan and did not file a claim. In January 2021, Plaintiff filed a proof of claim on behalf of Gonzalez stating that she had a $20,000 secured claim. Defendants never filed an objection to this claim, and Plaintiff never raised any issues related to the proof of claim or Defendants' failure to participate in the Chapter 13 case. In June 2022, Plaintiff then filed this adversary proceeding seeking to determine the amount of the claim.

Legal Framework

Having considered the testimony of witnesses, the documentary evidence received at trial, the oral and written arguments of the parties, and the other matters of record before the Court, the Court makes these findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

In the Complaint, Plaintiff requests a ruling on the amount owed on the Notes pursuant to the Declaratory Judgment Act. That Act provides in relevant part that "[i]n a case of actual controversy within its jurisdiction, ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of

any interested party seeking such declaration, whether or not further relief is or could be sought. 28 U.S.C. § 2201(a) . In addition, "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, … against any adverse party whose rights have been determined by such judgment." 28 U.S.C. §2202 (omitting exceptions not relevant).

The parties have both consented to this Court's jurisdiction and right to rule on the relief requested. Adv. 1:22-ap-01026-MT, ECF docket no. 8, p. 4. Federal Rule of Bankruptcy Procedure 7001(9) contemplates declaratory judgments in bankruptcy litigation. Fed. R. Bankr. P. 7001(9); 10 Collier on Bankruptcy ¶ 7001.10 (Richard Levin & Henry J. Sommer, eds. 2019)

Plaintiff has the burden of proof both as the plaintiff and based on the rebuttable presumption provided by California law where Plaintiff has signed the promissory notes. When a party has the burden of proof on any claim by a preponderance of the evidence, it means the judge must be persuaded by the evidence that the claim is more probably true than not.

Here, Defendants claim they are owed a total of $125,000 based on the three Notes. Defendants rely on both testimony that only a $1000 payment was ever made as well as the evidentiary presumption that possession of the promissory notes give them. "The fact that evidence of the debt such as the promissory note, deed of trust, and other security documents remains in the hands of the creditor without being cancelled or

released raises the rebuttable presumption that the debt has not been paid; such documents are typically returned to the debtor in exchange for payment of the debt." Harlow v. United Title Guar. Co., 145 Cal. App. 2d 672, 674 (Cal.Ct.App. 1956), citing Loucks v. Luckel, 107 Cal. App. 2d 217, 219 (Cal. Ct.App. 1951).

Plaintiff has asserted an affirmative defense to Defendants' reliance on the presumption under California law. "Pursuant to § 631 of the Evidence Code, a payment delivered by one party to another is presumed to be in payment of an indebtedness due to the latter.  Cal. Evid. Code § 631; Tipps v. Landers, 182 Cal. 771, 775, 190 P. 173, 175 (1920) (construing similar Code of Civil Procedure former § 1963(7)).  This presumption affects the burden of producing evidence, shifting the burden to the one who contends that the delivery was not in payment of an obligation due the recipient. Evidence Code § 604; see McKay v. McKay, 184 Cal. 742, 745, 195 P. 385, 386 (1921) (presumption is rebuttable); In re Estate of Miller, 143 Cal.App.2d 544, 299 P.2d 1005 (2d Dist.1956).  See also Burden of proof, 3 Cal. Affirmative Def. § 69:12 (2d ed.).

Plaintiff believes he has rebutted any presumption with the testimony of three witnesses who support the assertion that some funds were paid to defendants. It is important to note that "[t]he presumption is not evidence (see Cal.Code Evid. § 600), and it may be rebutted in various ways. When debtor and creditor are in a fiduciary or confidential relationship or are friends of long standing, the court may recognize that the parties may not have taken the usual safeguards for the protection of the debtor. Loucks v. Luckel, 107 Cal. App. 2d 217, 219, 236 P.2d 905, 906 (1951). As discussed more

later, Plaintiff has partially rebutted the presumption that the debt contained in the three

notes was not paid.

Findings of Fact

The parties began doing business together in the Spring of 2017.  Flores knew

Calzadilla from being in the same business and approached him to see if he could hold

events in Calzadilla's banquet halls. It was unclear from all testimony exactly what

Defendants were to provide and what Flores was to provide. Calzadilla testified initially

that sometimes Defendants were to provide food, drink, entertainment, and related party

items for the celebrations, but he backtracked on that and seemed to rely mainly on

providing the items listed in the salon reservation forms or "contracts" filled out by Flores

and Defendants' office staff.  Gonzalez also testified to one specific occasion where she

had to pay the caterer herself because Flores did not have the money and the caterer

showed up with the food right before the event. Defendants indicated that such things

had happened other times but provided no details.

The Booking System

Gonzalez described the system for booking the halls very clearly and

convincingly. When a date for an event was needed, Flores would go to Defendants'

offices at one of Defendants' halls, 6711 S. Broadway in Los Angeles (the "Salon

Broadway") and have the office staff fill out a form. The form contained the date of the

event, who was reserving the room, which of Defendants' three banquet halls was being

reserved, and what services were being provided. Sometimes the forms stated certain

color or types of tablecloths to be used. Once that form was in the book, that date could not be reserved for anyone else. The amount of the hall rental was written on the form. It appeared the date was arranged verbally beforehand, but nothing was firm until the form was filled out and a deposit paid.

Defendants stated that they usually charge their customers at the time they reserve the halls and not when the event is held. The receipt books bear this out. They made an exception with Flores and extended credit to him at the time of the booking. Flores attempted to disavow the rental agreements by saying they were fabricated and he had not seen them before the lawsuit. This testimony was not credible because he seemed familiar with them generally and implicitly adopted some of them in other parts of his testimony. Many were done in the same handwriting as the form he did admit to. His name as the person renting the hall was written on the agreements as "Luis Angel". Plaintiff also referred to the events and agreed that he was booking that many events. He had to agree he entered into one of the agreements because he signed it, <u>see</u> Defendants' Ex.116, but he appeared to be prevaricating when he denied knowing about the other agreements.

It was not plausible that there would be no written record of what was booked, especially since Flores kept saying that Defendants wrote everything down, so he did not keep any records himself. While he pretended not to know about all of them, he and Calzadilla both testified about reaching the agreement to rent the halls and the many events that were coming up that he needed them for. These forms were simply

documenting the verbal agreement they had already reached. These rental agreements, Defendants' Exhibits 115-144, are, in fact, contracts even though Flores did not sign them.  Plaintiff and both Defendants explained that there were different prices for each of the three halls since they were different sizes. Plaintiff testified that the agreement he had with Calzadilla was that the smaller hall, "Salon Broadway," was supposed to rent for $2000.  "Salon Dreams" was to rent for $2500, and "Salon Riviera" for $2800. Calzadilla indicated that he had reached an agreement with Defendant but was evasive on what the rent was for each hall.  Gonzalez insisted that the rent was $3000 for Salon Dreams and higher for the other rooms. Defendants have listed each of the agreements in a chart as Exhibit 114 that summarize the rental agreements. Exhibit 145 was mistakenly included on the chart but is stipulated not to be an agreement with Plaintiff. The 30 rental contracts with Plaintiff total $116,000.

Gonzalez testified that Flores manipulated the office staff to put a lower price than what was agreed to and she changed the amount afterwards to the correct amount when she was reviewing the reservations. She considered the forms binding contracts even though Flores had not signed them.  Plaintiff contends that his negotiated prices would have put the total due for those bookings at much less than Defendants are demanding. He never explained exactly how each one is wrong and has some generalized theories that make for a lower rent. Plaintiff's main complaint seems to be that the agreement he entered into was changed by the sticky note to a higher rent after he agreed to it. Closer study of the actual rental agreements indicates that his complaint about the sticky notes added after the fact is referring to solely 5 of the 30 agreements.

Only five of the rental agreements in evidence, Defendants' Ex. 115, 116, 118, 119, and 120, contain one price written on the form and then a sticky note attached to the form with a higher price written on it. For example, Exhibit 115 for a March 4 event at Salon Dreams lists $3,000 on the actual agreement for the rental. The amount of $3,500 is hand-written on a sticky note put on top of the form. Sometimes no price was written on the Agreement, but the amount charged was the same as other agreements for the same hall. See e.g., Exhibit 121-122.

Reviewing all of the documents and making sense of the sequence of events each witness put forward, the most likely sequence of events is that Gonzales and Calzadilla had a verbal agreement to rent Defendants' three salons to Flores for either the prices written on the original contracts or a price to be determined later. Calzadilla's verbal agreement with Flores for the amount of the rental was not conveyed to his wife quickly enough so that Flores had the office staff fill out the salon reservation form with the lower number he thought Calzadilla had agreed to. Gonzalez was able to clarify and get the correct amounts on the agreements by a later date but the first 5 agreements were done with the lower amounts written originally on the rental contracts. Those lower amounts are properly used for the rental price as they appear to be what the original agreement was between Plaintiff and Calzadilla. The sticky notes Gonzalez attached after the fact are not part of the agreement that Flores entered into.  The sticky notes added to the contracts total $6000. The rental amounts on the written contracts, minus the amounts added by the sticky notes, total $110,000.00. This is the clearly documented rent part of Flores' debt to Defendants.

The Promissory Notes

There is no dispute that a promissory note and Deed of Trust was executed on April 17, 2017 (Plaintiff's Exhibit D and Defendants Exhibit 110), but what the debt was for is not entirely clear.  Defendant states that Plaintiff owed Defendants $17,500. Plaintiff executed a combined promissory note & deed of trust, with the Defendant for $30,000 lent to Plaintiff (the "First Note"), secured by Plaintiff's Property.  Plaintiff's Trial Ex. D.  Plaintiff contends that the $30,000 listed on the promissory note was to incorporate the sum he owed (at that time) for the events held to date, and the remainder of the $30,000 ($12,500, if using $17,500 owed) towards any future events.

Defendants claim that Plaintiff then booked nine events between April 17 and June 11, 2017, thus incurring additional debts to Defendants.  Defendants' Ex. 120-128; Ex. 114 ("Defendants' Spreadsheet").  Both parties agree that Defendants began to pressure Plaintiff for payment in May 2017.

Plaintiff alleges that Defendant advised him on June 9 that his debt exceeded the $30,000 provided for in the First Note. According to Defendants' Spreadsheet, as of June 9, 2017, Plaintiff owed $40,500.  See Ex. 114.  There were also numerous events already booked for at least the next month. Plaintiff alleges that Defendant demanded that he execute a new note for $45,000 and to pay him $30,000 to reduce the balance, or Plaintiff would be cut off from further bookings.  Plaintiff owed another $12,000 in pending bookings that would have been cancelled.  Defendants' Ex. 127 -129.

The parties then signed another note and Deed of Trust dated June 9, 2017, in the face amount of $45,000. ("Second Note").  Plaintiff's Ex. B; Defendants' Ex. 111.  It was Plaintiff's position at trial that the $30,000 listed in on the First Note was to incorporate the sum he owed (at that time) for the events held to date, including the amounts owed under the First Note, and the remainder of the $45,000 as credit towards any future events.  After June 9, 2017, Defendant again allowed Plaintiff to resume booking events.  See Defendant's Ex. 126; 127; and 128; see also Ex. 114.  From June 12, 2017, to August 19, 2017, Plaintiff admitted to having booked nine events, thus incurring additional debts to Defendants. Defendants assert that these events were $36,500. Plaintiff admits to having no record for these events. Defendants' Ex. 129-137; see also Ex. 114.

On August 22, 2017, Plaintiff alleges that Defendant demanded that he execute a new promissory note and Deed of Trust for $50,000 and to pay him another $20,000 to reduce the balance, or he would refuse further bookings.  Plaintiff executed another combined promissory note & Deed of Trust (the "Third Note"), securing a debt of $50,000 with a Deed of Trust on Plaintiff's home.  Plaintiff's Ex. B.

Plaintiff maintains that $50,000 was not actually lent to him on August 22. Instead, the parties intended to incorporate the sum owed to Plaintiff under the Second Note, with the remainder intended to secure payment for future events Defendant apparently continued to extend Plaintiff credit up to $125,000, despite his position that Plaintiff never made any cash payments towards the debt.

Plaintiff admits to having booked 7 or 8 events from August 27, 2017 to December 2, 2017, thus incurring additional debts to Defendants.  Defendant asserted that these events were $31,000. See Ex. 114.  Plaintiff admits to also having no record for these events

Defendants assert that the notes came due from 2018 to 2020, but no payment was made.  Defendants state that Plaintiff promised to pay as his business grew and they attempted to work with Plaintiff.  When no payment was made by 2020, Defendants instituted foreclosure of the Property. Plaintiff's Ex. G. The First Note listed a maturity date of June 18, 2018. Defendants' Ex. 110, internal ¶ 4(c). The Second Note listed a maturity date of September 29, 2017. Defendants' Ex. 111, internal ¶ 4(c). The Third Note listed a maturity date of December 29, 2017. Plaintiff's Ex. F; Defendants' Ex. 112, internal ¶ 4(c).

The three Notes all use the same basic form template that has blank spaces to fill in names, amounts, and dates.  Defendants' Ex. 110; 111; and 112.  Under the heading "MATTERS RELATED TO PAYMENT," the clauses under "Interest" and "Promise to Pay" are blank and do not provide a payment schedule, nor a breakdown of the required monthly payments.  Id. at ¶¶ 3 and 4.  No percentage rate of interest is specified.  Id.  The Notes also provide for Plaintiff (referred to in the documents as "Trustor") to make periodic payments to Defendants (referred to in the documents as "Beneficiary") for taxes against the Property, ground or lease payments on the Property,

and premiums for "any and all insurance" required by Beneficiary.  Id. at ¶ 6.  Because

the interest rates had not been filled in on the Notes, Defendants have stipulated that

they are not seeking interest on the debt owed.


Loans from Damian Useda

Flores borrowed money from his nephew, Damian Useda ("Useda"), and

explained how those loans allowed him to pay Calzadilla. Flores first borrowed $3,000

from Useda on April 28, 2017. See Plaintiff's Ex. A.  The note documenting the loan

states that it was an "advance to the purchase of the Property on Community Street."

On June 2, 2017, Flores then executed an unsecured promissory note for $33,900,

payable to Useda, incorporating the $3,900 Plaintiff already owed Useda, plus another

$30,000 he borrowed. Plaintiff contends that he used the $30,000 in cash to pay

Defendant to reduce the balance owed. Plaintiff's Exhibit B supports both Useda and

Flores' testimony that Flores borrowed $33,900 on June 2, 2017.


Then on June 9, 2017, Plaintiff executed a secured promissory note for $50,000,

payable to Useda, incorporating the $30,900 Plaintiff already, plus another $16,100 he

borrowed. Flores said that when he borrowed $50,000 from Useda, he kept $20,000 for

his events and paid Calzadilla $30,000. Plaintiff's Exhibit C is dated June 9, 2017, and

titled a "Secured Promissory Note" and is for $50,000, again secured by the Community

Street Property.

Flores has not paid the money back to Useda and was making a story up as he testified that he paid $20,000 to Useda after filing Chapter 13 that he never reported to the Chapter 13 Trustee.  It did not appear Useda had the funds to pay Useda back and Useda denied being paid back. There appears to be some effort to have Useda get the Community Street Property but that was not explored.

Amounts owed

There was very confused testimony by both Flores and Calzadilla about whether the Notes secured rental agreements that had already happened or that had already been entered into or future expenses that Flores was likely to incur. Part of the confusion seems to be because Flores did not put down the deposit Defendants normally required at the time a hall was reserved. Defendants were effectively extending credit to Flores because they could not rent the rooms to anyone else. Flores saw the rental costs as amounts he did not yet owe.

The Notes seem to cover rooms that were already booked and not paid for and, at times, potential future bookings. They also covered some expenses where Defendants had to pay for catering because the caterer, DJ or bartender showed up and Plaintiff had no money to pay them.  The testimony that additional funds were paid to a caterer to save Flores' event was credible and does justify some additional charge above the room rentals.

Calzadilla testified persuasively that he regularly had to give Flores money because he came crying to him and because events needed payment at the last minute for them to continue. Flores also testified he regularly paid Calzadilla back in cash during events when he received it from customers. Neither of them provided any specific amounts, dates or receipts. Calzadilla stated that he "just knows he is owed $140,000" and then later said he is owed $145,000.  Gonzalez testified credibly that sometimes they needed to pay for a DJ or a bartender or food or Plaintiff's event just would not happen. Defendants' reputation was also on the line with these vendors since they owned the halls. It is really not possible to say exactly what was owed for the incidentals or cash advances that were not rent, but it was significantly more than a *di minimis* amount.

The three Notes total $125,000.  The rent totals $110,000. The $15,000 difference between the rental totals and the promissory notes seems to be a reasonable estimate of what was advanced. The incidental amounts testified to by Defendants along with the face amount of the notes justify the additional $15,000 as Plaintiff has not rebutted that incidentals were paid for from time to time. The total amount of the Notes is justified as the total debt owed. The remaining issue is how much has been paid toward the notes.

Amounts paid

Defendants claim that the only payment made was an early payment of $1000 documented on Exhibit 116. Flores claims that he made a $30,000.00 payment followed

by a $20,000 payment. No written receipt exists for either payment.

Flores testimony about the $30,000 payment was supported by his nephew, Mario Flores ("Mario"), as well as Useda's testimony. Mario testified that he worked with Flores on weekends for the events and regularly saw Flores receive cash during events. He had no idea how much. He also accompanied Flores in early June to visit Useda at his office. There was no one else present besides him, Useda and his uncle. He saw a bunch of cash in stacks with rubber bands or paper clips. He saw a hundred dollar bill on top and on the bottom, but he did not know how much it was. Mario and Flores then drove to Calzadilla's office at Salon Broadway. The meeting was in the afternoon before an event.  The money was in an envelope between them in the car. Flores took the envelope and went into the office and met with Calzadilla while Mario waited in the car. Flores did not have the envelope with him when he came out. They then went and purchased things for that evening's event and went to work at it.

Damien Useda's testimony supports Flores in that the money was borrowed from him when Calzadilla was insisting on payment along with another promissory note. The documents supporting the loans from Useda lend credence to Flores' statement that he borrowed the money in order to pay Defendants. In addition to this version of events being more credible, it appears that Defendants were becoming increasingly upset about the continued use of the halls without receiving payment. Calzadilla testified about how annoyed he was getting with Flores. It is unlikely that they would have relied solely on a promissory note that would have been a significant hassle to enforce.

Plaintiff alleges that he also tendered $20,000 in cash on August 22, 2017 to Defendant in his office at the Salon Broadway. There were no witnesses to this payment. Plaintiff claims that the cash was in part what he received from Useda and cash he had made. Plaintiff had held about 10 events since his last big payment to Calzadilla, so he should have had sufficient cash for that payment. Defendant also denies receiving this payment. Plaintiff calculates this would have reduced his balance owed to Defendant from approximately $30,000 to $10,000, but how he reached that conclusion is unclear.

Lastly, Flores asserts that when the partyholders paid him in cash, he turned around and paid Defendants for the venue in cash as well. Flores had no bank account and seems to have dealt only in cash. He asserts that Calzadilla would enter the amount of cash he paid in a ledger of some sort. Defendants assert that no ledger exists and they instead use a receipt book, in which no receipts for Plaintiff's alleged payments exist. Flores testified that after the event was over, he had been paid in full, and the customer was satisfied, he did not retain records. He also had no list or calendar of events that he held.

Gonzalez introduced the receipt books for the year 2017.  It is clear that she and her office kept careful track of the amounts paid for the rentals.  <u>See</u> Defendants' Exhibits 146.1 to 146.4. There are simply no receipts for any cash received from Flores. She points to this as evidence of Flores not making the two large payments to her husband.  Calzadilla's testimony, however, was inconsistent with hers in part. He seemed to think there were some other records in some calendar that he no longer had.

Calzadilla was clear that he did not always feel he needed to document things with Flores because he trusted him at that time. When pressed for clarification, his testimony became even more vague and confusing.  He first insisted that he never received a penny from Flores and then admitted when shown a room rental contract that he did receive a $1000 payment.  He also seemed confused as to whether Flores was paying for the room, guards, tablecloths and security or also the food and drinks. Calzadilla stated at one point that he was not quite sure what Flores actually owed – it appeared to be a rolling amount for various items. Their verbal agreements or times he stepped up and covered payments for Flores' events were vague.

He also said he pressed Flores for money and failing that, needed another promissory note. He claimed he never got the large sums Flores testified to, but that did not seem credible, given how upset he was at the lack of payment.  Defendants ran the same business and could not run their own parties if Flores was using the halls. They also appeared to know what type of profit Flores was likely making on the parties. Not having payments would have been hard on them for 7 months. They likely would have stopped renting the halls more quickly had they not received any of the cash Flores was taking in for the events he ran.

The other factor making it seem odd that the Defendants believed that the full amount of the Notes was still due is that the foreclosure notice was for $50,000. Plaintiff's Ex. G.  Neither party addressed this at trial, so the reason for this would be speculation.

Defendants' position seems to be that, after Plaintiff failed to pay one single dollar towards his debt, they continued to extend Plaintiff credit up to $125,000 because "the one year provided for payment in the Note had not yet expired and the value of the Property provided security." See Defendant's Trial Brief, 3:22-25.  Plaintiff's version of events that Calzadilla wanted cash plus a promissory note made more sense and appeared bolstered by other testimony and some documentary evidence.

While all witnesses were biased and the payments were not documented, the most credible sequence of events was that $50,000 was paid towards the $125,000 debt and no one kept track of which Note to cancel.

Whether Promissory Notes Extinguish Earlier Ones

Plaintiff's argument that the Notes each incorporated or extinguished the earlier one is not supported by the language of the Notes themselves or the debts Plaintiff was racking up for the rentals. Based on the nature of his business, his admission of confusion over what he owed, and the specific rental agreements, Plaintiff clearly owed Defendants much more than the $50,000 he paid them and must have known that.

Flores really had no idea what he owed and knew signing whatever promissory note was needed would keep his business going. He essentially admitted that he guessed at a $20,000 debt in his bankruptcy schedules and in the claim he filed on Defendants behalf. In his pretrial deposition on February 3, 2023, Flores was asked what he owed as of the date of the deposition. He stated he owed $50,000 and that it

has been owed since 2017. See Flores Deposition,18:15-19, February 3, 2023.  He

attempted to explain his answer of $50,000 by saying he was simply referring to the last

note he signed for $50,000. The question of what he owed was clear and was translated

for him. Believing he still owed $50,000 also makes no sense if Plaintiff's testimony that

he had already repaid $50,000 is to also be believed. He simply did not keep track or

threw out any documents on which he kept track of the expenses he was incurring to

keep his event business going.


The entire $125,000 was appropriately owed minus the $50,000 paid in cash.

Plaintiff still owes defendant $75,000.


Credibility Determinations

One difficulty here is the way the parties kept records, dealt primarily in cash and

made many agreements solely verbally. The relationship between the parties during trial

was obviously quite strained and almost volatile, with a good portion of the testimony

provided through an interpreter, so having any clear recitation of the activities leading to

this conflict was a challenge. Debtor Flores appeared to not remember most of what he

signed and kept no written records of anything. He was not credible on some topics

because he was evasive and ignored clear documentary evidence. On the other hand,

most of his dealing were with Calzadilla whose testimony was confusing. Calzadilla also

did not seem fully aware of the details of the arrangements his wife stated were the

records of what he entered into with Flores. Gonzales kept good records but had not

been personally involved in the discussions Calzadilla and Flores had over the rental of

the salon and did not appear to be present when payments were allegedly made.

Neither Flores nor Calzadilla seemed to inform Gonzales of all that they discussed.

Plaintiff's nephew Mario was totally credible. He did not exaggerate what he saw and seemed forthcoming about what he could not remember or did not see. He appeared sympathetic towards Plaintiff because of their close relationship but he did not seem to make up facts or exaggerate. Damien Useda was also quite credible and appeared to provide solely what he remembered from 2017. He did not rubber stamp either Plaintiff's or Mario's testimony but provided convincing testimony that bolstered the fact that Plaintiff borrowed $50,000 from him in order to pay Defendants something towards the debt he owed.

Defendants reserved Calzadilla's cross and his own direct testimony for his case in chief.  When he finally testified in Defendants' case in chief, it was following Gonzalez' testimony and was kept very brief. The rambling confused testimony Plaintiff elicited was avoided and it appeared his testimony was kept short so not to contradict Gonzalez. Gonzalez was quite credible, and it was not clear if she knew if Calzadilla got paid something by Flores.

Attorney Fees

Defendants are requesting their attorney fees based on the language of the promissory note. Each of the Notes states "[t]he Trustor may be charged with fees in association with the default of this Trust or for the protection of the Beneficiary's interest

for this Trust, which may include, but is not limited to attorney' fees and property

inspections (the "Additional Fees")." (Ex. 104-106, p. 11, para. 32)

 

     Federal Rule of Bankruptcy Procedure 7054(b) states in pertinent part that this

court may allow costs to the prevailing party in an adversary proceeding. In Travelers

Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 127 S.Ct. 1199, 167

L.Ed.2d 178 (2007), the Supreme Court held that when a pre-petition contract

authorizes a creditor to recover attorney's fees, these fees may constitute an allowed

claim under Bankruptcy Code § 502, even if the fees were incurred in post-petition

bankruptcy litigation. As the Notes at issue are subject to California law, this Court must

look to California law to determine the identity of the prevailing party. See In re Mac-Go

Corp., 541 B.R. 706, 714 (Bankr. N.D. Cal. 2015), citing Travelers Cas. & Sur. Co. of

Am., 549 U.S. at 448.

 

     California law has two potentially applicable prevailing party doctrines that differ

substantially.  Civil Code § 1717(a) provides that "[i]n any action on a contract, where

the contract specifically provides that attorney's fees and costs, which are incurred to

enforce that contract, shall be awarded either to one of the parties or to the prevailing

party, then the party who is determined to be the party prevailing on the contract,

whether he or she is the party specified in the contract or not, shall be entitled to

reasonable attorney's fees in addition to other costs." Under § 1717(b)(2), the "party

prevailing on the contract shall be the party who recovered a greater relief on the

contract. The court may also determine that there is no party prevailing on the contract

for purposes of this section."

California Code of Civil Procedure § 1032(b) entitles a "prevailing party" to "recover costs" as a matter of right "in any action or proceeding." Costs may include attorney's fees when authorized by contract, even when the action is not "on a contract." See California Code of Civil Procedure § 1033.5(a)(10). California Code of Civil Procedure § 1032(a)(4) defines a "prevailing party" to include (a) the party with a net monetary recovery; (b) a defendant in whose favor a dismissal is entered; (c) a defendant where neither plaintiff nor defendant obtains any relief; and (d) a defendant as against those plaintiffs who do not recover any relief against that defendant." Where a party falls squarely within one of these four definitions, a trial court has little discretion in determining the prevailing party, particularly when there is a party with a "net monetary recovery." See, e.g., Goodman v. Lozano, 47 Cal.4th 1327, 104 Cal.Rptr.3d 219, 223 P.3d 77 (2010).

Defendants did not specify under which provision of California law they are seeking an award of attorney's fees.  For the reasons stated below, California Civil Code § 1717 is the applicable prevailing party doctrine. Debtor's claim for declaratory relief was an "action on a contract" because he was requesting that the Court determine whether, and to what extent, he performed under the Notes, i.e., how much money was paid on the Notes. This court must liberally interpret § 1717, and the fact that the Plaintiff's claim for relief was based on the Declaratory Relief Act does not change the analysis. See In re Penrod, 802 F.3d 1084 (9th Cir. 2015)

California courts liberally construe 'on a contract' to extend to any action as long as an action involves a contract and one of the parties would be entitled to recover attorney fees under the contract if that party prevails in its lawsuit. [¶] [S]ection 1717 broadly applies to any dispute involving a written agreement.... Further, the type of relief sought begs the question of whether section 1717 applies. In determining whether an action is "on the contract' under section 1717, the proper focus is not on the nature of the remedy, but on the basis of the cause of action, [citations omitted.]

In re Tobacco Cases I, 193 Cal.App.4th 1591, 1601–02, 124 Cal.Rptr.3d 352 (2011). It does not matter whether the fees were incurred offensively or defensively. Shadoan v. World Savings and Loan Association, 219 Cal.App.3d 97, 107, 268 Cal.Rptr. 207 (1990).

Plaintiff admitted that he owed $20,000 and sought a determination resolving the dispute. He then seemed to admit that he owed $50,000 during his deposition. After trial, he has been found to owe $75,000. Defendant is the prevailing party.  One matter that has understandably not been raised thus far is whether any settlement offer was made before the trial. If that offer was the same or more than what Plaintiff is found liable for, there may be grounds to examine the fees more closely.  Plaintiff, however, must raise such an issue and clearly brief any grounds for any reduction.

The calculation of a reasonable attorney fees award begins with the lodestar figure, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Miller v. Los Angeles County Bd. of Educ., 827 F.2d 617, 621 (9th Cir 1987) (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 564, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). There is a strong

presumption that the lodestar amount is reasonable. <u>Jordan v. Multnomah County</u>, 815 F.2d 1258, 1262 (9th Cir 1987).

After making the computation, the court then must assess whether it is necessary to adjust the presumptively reasonable lodestar figure based on the <u>Kerr</u> factors  that are not already subsumed in the initial lodestar calculation. <u>Morales v. City of San Rafael</u>, 96 F.3d 359, 363-4 (9th Cir. 1996). The twelve <u>Kerr</u> factors are: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill requisite to perform the legal service properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client; and 12) the awards in similar cases. <u>Kerr v. Screen Guild Extras, Inc.</u>, 526 F.2d 67, 70 (9th Cir. 1975), *abrogated on other grounds by* <u>City of Burlington v. Dague</u>, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

//

//

//

//

//

//

//

Defendants shall submit an itemization of the attorney fees they seek by June 26, 2023. Any objection by Plaintiff must then be filed by July 5, 2023. A reply may be filed by July 12, 2023, and the Court will then rule without a hearing on what attorney fees may be included.

Defendants should submit a judgment and order consistent with these findings. The hearing on this matter set for June 30, 2023, is hereby vacated.

###

Date: June 15, 2023

Maureen A. Tighe
United States Bankruptcy Judge